# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; and<br><br>NATIONAL WILDLIFE FEDERATION,<br><br>      Plaintiffs,<br><br>v.<br><br>ENVIRONMENTAL PROTECTION AGENCY;<br><br>E. SCOTT PRUITT, in his official capacity as the Administrator of the Environmental Protection Agency;<br><br>ARMY CORPS OF ENGINEERS;<br><br>RYAN A. FISHER, in his official capacity as the Acting Assistant Secretary of the Army (Civil Works); and<br><br>R.D. JAMES, in his official capacity as the Assistant Secretary of the Army (Civil Works),<br><br>      Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 18-cv-1048 |

## INTRODUCTION

1.     The purpose of the Clean Water Act (the Act) is to protect and restore "the Nation's waters." The Environmental Protection Agency (EPA) and Army Corps of Engineers (the Corps) (collectively, the Agencies) are tasked with applying the Act's protections to the "waters of the United States."

2.      In 2015, the Agencies promulgated the Clean Water Rule (the Rule), which clarified the scope of "waters of the United States." They explained then that the Rule would "ensure protection for the nation's public health and aquatic resources" and increase "program predictability and consistency."

3.      The Clean Water Rule was the product of four years of extensive public outreach and rulemaking effort. The Agencies received more than a million public comments on the proposal. The final Rule was supported by a massive body of peer-reviewed scientific literature, as well as legal, policy, and economic analyses.

4.      The Trump administration intends to repeal the Rule. President Trump issued an Executive Order directing the Agencies to propose "rescinding or revising" the Rule, and he and EPA Administrator Scott Pruitt have made many public statements harshly denigrating the Rule.

5.      Instead of formally repealing it, however, the Agencies have now rushed through a two-year suspension of the Rule. The suspension nullifies the Rule for two years, and leaves nothing on the books in its place. The Agencies intend for the suspension to last until they finalize a repeal and replacement of the Rule.

6.      While the Clean Water Rule is suspended, the Agencies intend to implement the now-repealed regulations that preceded it, but only as those are "informed by applicable agency guidance documents" and "consistent with Supreme Court decisions and longstanding agency practice."

7.      In suspending the Rule, the Agencies expressly refused to consider the single most important issue at stake: the Rule's substantive merit relative to the tangle

of policies the Agencies plan to apply instead. The Agencies' rulemaking record identifies no substantive defect in the Rule they have suspended, and no disagreement with the policies it contains. For all that appears from the record itself, the Agencies may believe the Rule is vastly superior, in every respect, to the pre-Rule policies they intend to enforce. Nonetheless, the Agencies have deprived the public of the Rule's benefits for two years, all while refusing to consider the impact of what they are doing on the nation's waterways and the people who use and depend on them.

8.    The Agencies' only proffered rationale for the suspension is that it will promote regulatory clarity and certainty. In light of the administration's open antipathy for the Rule's provisions, that rationale rings hollow. But it is also belied by the record: there is no evidence that suspending the Rule will promote clarity or certainty, and ample evidence that suspending the Rule will *create* confusion and uncertainty.

9.    The Trump administration is entitled to work toward enacting its own policy preferences into law. But it must do so within legal bounds. The Agencies must provide a meaningful opportunity for the public to comment on proposed decisions, and must maintain an open mind toward those comments. Critically, they must have rational, record-based explanations for their final decisions, including why they are disregarding any facts and circumstances that motivated the policies they are upending.

10.    The Agencies' hasty, slipshod suspension of the Clean Water Rule violates these and other requirements of the Administrative Procedure Act. It also violates the Due Process Clause of the Constitution, because Administrator Pruitt has a closed mind with respect to the Clean Water Rule. The suspension rule must be vacated.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. The relief sought is authorized by 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and 5 U.S.C. § 706.

12.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e)(1)(C) because this is a civil action brought against agencies of the United States and officers of the United States acting in their official capacities and under the color of legal authority, and because plaintiff Natural Resources Defense Council (NRDC) maintains its principal place of business in New York City. 28 U.S.C. § 1391(c)(2).

## THE PARTIES

The Plaintiffs

13.     Plaintiff NRDC is a national environmental advocacy group organized as a New York not-for-profit membership corporation. NRDC has offices in New York, Washington DC, Chicago, San Francisco, and Santa Monica, and has hundreds of thousands of members. NRDC's mission is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC staff members work to secure Clean Water Act protections for a broad range of aquatic resources, including small, seasonal, and rain-dependent streams, as well as wetlands, ponds, and other waters. In furtherance of these goals, NRDC worked to ensure that the administrative action that culminated in the Clean Water Rule provided robust protections for these vital water resources, on which NRDC's members and many other Americans depend. Since the Clean Water Rule was finalized, NRDC has litigated to

4

defend the Rule against claims that it is over-protective, and has litigated to strengthen the Rule where it is under-protective. More recently, NRDC has submitted comments and other communications to the Agencies opposing any plans to suspend, repeal, or replace the Rule.

14. Plaintiff National Wildlife Federation (NWF) is a national not-for-profit membership organization dedicated to the protection of the environment and natural resources. Founded in 1936, NWF is a member-supported nonprofit conservation, advocacy, and education organization. NWF has more than six million members, partners, and supporters nationwide, and has affiliate organizations in fifty-one states and territories. NWF's mission is to educate, mobilize, and advocate to preserve and strengthen protection for wildlife and wild places. Among other things, this includes advocating for the protection of vital resources such as the wetlands, streams, and rivers upon which wildlife depends. As a result, NWF has a strong interest in ensuring that these waters are protected by the Clean Water Act, and has worked on behalf of its members and affiliates for the last seventeen years—including participating in the rulemaking that resulted in the Clean Water Rule—to ensure that vulnerable waters receive the full protection of the Act, as required by law and justified by the current science. Since the Rule was finalized, NWF has participated in litigation to defend the Rule against claims that it is over-protective and to strengthen the Rule where it is under-protective. NWF has also submitted comments opposing the Agencies' plans to suspend, repeal, or replace the Rule.

5

15.     Plaintiffs bring this action on behalf of their members. Plaintiffs' members use, enjoy, and otherwise benefit from waters that would receive enhanced protection under the Clean Water Rule as compared to the pre-Rule regulatory regime. Defendants' suspension of the Clean Water Rule for two years harms Plaintiffs' members because it denies the full protection of the Clean Water Act to these water resources, leaving them vulnerable. These waters, if not fully protected by the Act as required by the Rule, risk greater contamination from pollution and other harms, which would pose health risks and lessen Plaintiffs' members use and enjoyment of the waters. Plaintiffs' injuries will be redressed by an order vacating the Rule's suspension.

The Defendants

16.     Defendant EPA is an agency of the U.S. government. EPA is responsible for implementing and enforcing most of the Clean Water Act's pollution-control programs. The EPA Administrator has ultimate responsibility for determining the definition of "waters of the United States" under the Act. Together with the Corps, EPA issued the suspension rule that Plaintiffs challenge in this action.

17.     Defendant E. Scott Pruitt, EPA Administrator, is the highest-ranking official in the EPA. Administrator Pruitt signed the suspension rule that Plaintiffs challenge in this action on January 31, 2018. Plaintiffs sue Administrator Pruitt in his official capacity.

18.     Defendant Army Corps of Engineers is an agency of the U.S. government and a branch of the Department of the Army. The Corps is responsible for implementing and enforcing one of the Clean Water Act's pollution-control programs.

Together with EPA, the Corps issued the suspension rule that Plaintiffs challenge in this action.

19.     Defendant Ryan A. Fisher signed the suspension rule that Plaintiffs challenge in this action on January 30, 2018, as "Acting Assistant Secretary of the Army (Civil Works)." In that position Acting Assistant Secretary Fisher supervises or supervised the Corps' Civil Works program, including its implementation of the Clean Water Act. Plaintiffs sue Acting Assistant Secretary Fisher in his official capacity.

20.     Defendant R.D. James was confirmed as the Assistant Secretary of the Army (Civil Works) on January 25, 2018. In that position Assistant Secretary James supervises or will supervise the Corps' Civil Works program, including its implementation of the Clean Water Act. Plaintiffs sue Assistant Secretary James in his official capacity.

## BACKGROUND

<u>The Clean Water Act's scope was unclear in the wake of Supreme Court decisions and agency "guidance"</u>

21.     Americans rely on clean water for drinking, for swimming and fishing, as habitat for wildlife, and for many other reasons. Wetlands serve numerous important functions, including flood control and pollutant filtration.

22.     Congress enacted the Clean Water Act to restore and maintain the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act applies a suite of pollution-control measures to "navigable waters," *see id.* § 1251 *et seq.*, which Congress defined as the "waters of the United States," *id.* § 1362(7).

7

23.     As to "waters of the United States," the Act ordinarily requires dischargers of pollutants to obtain a permit, *id.* §§ 1311(a), 1342, 1344; prohibits the discharge of high-level radioactive waste or medical waste, *id.* § 1311(f); protects against pollution from oil and hazardous substances, *id.* § 1321; and restricts sewage sludge disposal, *id.* § 1345, among other protections.

24.     In the 1980s, the Agencies adopted substantially similar regulatory definitions of "waters of the United States." The text of these definitions remained, for the most part, unchanged until the Clean Water Rule was enacted in 2015.

25.     Between the mid-1970s and early 2000s, the courts and the Agencies applied the Act broadly to protect many kinds of water bodies, including tributaries and wetlands. *See, e.g., United States v. Riverside Bayview Homes*, 474 U.S. 121, 123-24, 131-36 (1985). In 2001 and 2006, however, two Supreme Court decisions created uncertainty about what kinds of waters the Act protects.

26.     The holding of the first case, *Solid Waste Agency of Northern Cook County (SWANCC) v. United States Army Corps of Engineers*, 531 U.S. 159 (2001), was narrow: a regulatory interpretation protecting waters used by migratory birds was not authorized when applied to "an abandoned sand and gravel pit." *Id.* at 162, 174. The second case, *Rapanos v. United States*, 547 U.S. 715 (2006), produced no majority opinion. Still, the cases engendered widespread confusion over the scope of the Act's coverage.

27.     In *Rapanos*, the Court remanded, for further review, the Corps' application of the Act to wetlands near ditches that drained to traditional navigable waters. *See* 547 U.S. at 715, 729, 757 (Scalia, J., announcing the judgment of the Court) (plurality

opinion). Justice Kennedy concurred only in the judgment, concluding that the Act

protects waters that have a "significant nexus" to traditional navigable waters. *See id.* at

759 (Kennedy, J., concurring in the judgment). Appellate courts interpreting *Rapanos*

that have decided this issue have held that at least those waters meeting Justice

Kennedy's significant-nexus standard are protected by the Act.

28.     Although neither *SWANCC* nor *Rapanos* invalidated any regulatory

provision, the Agencies began to retreat from enforcing the regulatory text as written.

They issued ostensibly discretionary guidelines describing which waters were covered

by the Act. Such policies, along with *SWANCC* and *Rapanos*, created widespread

confusion and inconsistency with respect to the scope of the Act's coverage. The policies

had the practical effect of shrinking that coverage more than either ruling required.

29.     For example, the post-*SWANCC* guidance directed field staff to seek

headquarters approval before treating an intrastate, non-navigable, so-called "isolated"

water as covered by the Act. *See* 68 Fed. Reg. 1,991, 1,996 (Jan. 15, 2003). Although in

theory such waters were eligible for protection, in practice this guidance operated as an

effective ban on protecting such waters. EPA reported in 2011 that after *SWANCC*, "no

isolated waters [were] declared jurisdictional by a federal agency."

30.     The post-*Rapanos* guidance was also confusing and resulted in under-

enforcement of the Act's protections. For instance, it limited how the Agencies would

consider aggregate impacts of similarly situated waters when determining whether a

water had a "significant nexus" to waters downstream. The guidance also provided that

many waters had to be subjected to a case-by-case analysis in order to demonstrate

coverage under the Act. Requiring this resource-intensive, site-specific process not only created the potential for inconsistent interpretations, but also meant that in practice, many waters that should have been covered by the Act simply went unprotected. If there were questions about a water's "significant nexus," the Justice Department was reluctant to prosecute an enforcement case.

31.     The lack of clarity in the post-*Rapanos* guidance was compounded by its ostensibly discretionary terms. The guidance told field staff that its policies "may not apply to a particular situation depending on the circumstances," and third parties could challenge the "appropriateness" of applications of the guidance. It did not say when or how either determination should be made.

32.     The guidance also was confusing because rather than interpreting the relevant regulatory text, it was inconsistent with that text. For instance, the regulations provided that tributaries and adjacent wetlands were covered by the Act without qualification. The post-*Rapanos* guidance, by contrast, specified that many such waters were protected only upon satisfying the "significant nexus" test from Justice Kennedy's concurring opinion in *Rapanos*, or the test announced by the *Rapanos* plurality.

33.     Adding to the confusion, lower courts also disagreed on how to interpret the split decision in *Rapanos*, creating inconsistent rulings across different circuits. Some courts held that the plurality's test *and* Justice Kennedy's test could provide a valid basis for Clean Water Act protection, whereas others held that *only* Justice Kennedy's test was controlling.

34.     The Agencies later conceded that the guidance documents did not ensure timely, consistent, and predictable determinations on the scope of the Act's coverage. Members of Congress, developers, farmers, state and local governments, environmental organizations, energy companies and others asked the Agencies to replace the guidance with a regulation that would provide more clarity and certainty.

The Agencies promulgated the Clean Water Rule

35.     The Agencies responded, finally, by initiating a rulemaking to clarify the scope of the Clean Water Act's coverage. The rulemaking effort began in 2011, and culminated in the Clean Water Rule, issued in 2015.

36.     In support of the rulemaking, EPA's Office of Research and Development prepared a report that synthesized the published, peer-reviewed scientific literature discussing the connectivity between streams and wetlands and downstream water bodies. EPA released a draft for public review in September 2013, obtained a peer review of the report by the agency's Science Advisory Board, and published the final report in January 2015. *See* EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence*, EPA/600/R-14/475F (2015). The report found that *all* tributary streams exert a strong influence on downstream waters, that wetlands in a river's floodplain are "integrated" with the rivers, and that non-floodplain wetlands provide numerous benefits to downstream waters.

37.     In light of this strong scientific evidence, and using Justice Kennedy's "significant nexus" test from *Rapanos* as the key to the Act's scope, the Agencies proposed a rule clarifying that tributaries and adjacent waters, as defined (including

11

adjacent wetlands), categorically have a "significant nexus" to downstream waters and are covered by the Act. *See* 79 Fed. Reg. 22,188, 22,188-89 (April 21, 2014). The Agencies also proposed clarifying that certain other waters (such as non-adjacent wetlands) would be covered upon a case-specific, science-based determination of "significant nexus." *See id.* at 22,189, 22,193.

38. The Agencies solicited comment for over 200 days, and received over a million comments. They also received public input through an extensive outreach effort, including over 400 meetings with states, small businesses, farmers, academics, miners, energy companies, counties, municipalities, environmental organizations, other federal agencies, and many others.

39. The Agencies published the final Clean Water Rule on June 29, 2015.

40. The Rule was intended to ensure protection for the nation's public health and aquatic resources and increase the predictability and consistency of applications of the Clean Water Act by clarifying the scope of protected waters using more categorical determinations and bright-line boundaries.

States, industry, and environmental groups challenge the Clean Water Rule

41. Over one hundred parties, including states, industry, and environmental groups (including Plaintiffs here), sued to challenge various aspects of the Clean Water Rule. Most filed challenges in district court as well as in circuit court, due to uncertainty over whether the Clean Water Act's provision for exclusive circuit court review, 33 U.S.C. § 1369(b)(1), encompassed the Rule.

12

42.     The state and industry challenges alleged, for the most part, that the Clean Water Rule reached too many waters, and that it was promulgated in violation of procedural requirements of the Administrative Procedure Act. Administrator Pruitt, who was then the Attorney General of Oklahoma, challenged the Rule on behalf of the State of Oklahoma.

43.     The challenge brought by Plaintiffs here alleged that narrow aspects of the Rule were illegally under-protective of the nation's waters, and were promulgated in violation of procedural requirements of the APA.

44.     The circuit court petitions challenging the Rule were consolidated in the U.S. Court of Appeals for the Sixth Circuit.

45.     The Judicial Panel on Multidistrict Litigation denied the government's request to consolidate the district court cases under 28 U.S.C. § 1407, on the basis that the cases would involve questions of law and minimal discovery, so centralization would "not serve the convenience of the parties and witnesses or further the just and efficient conduct of this litigation." *In re Clean Water Rule: Definition of "Waters of the United States,"* 140 F. Supp. 3d 1340, 1341 (J.P.M.L. 2015).

46.     North Dakota, eleven other states, and the New Mexico Environment Department filed a challenge in the District of North Dakota on June 29, 2015. On August 27, 2015, one day before the Clean Water Rule's effective date, that court granted the plaintiffs' motion for a preliminary injunction, and enjoined enforcement of the Rule. The court later clarified, at the Agencies' urging, that the injunction extended only to the 13 states that were plaintiffs to that case.

13

47.     The Clean Water Rule went into effect on August 28, 2015, in the remaining 37 states. The Agencies implemented the Rule in those states for six weeks, until the Sixth Circuit issued a nationwide stay of the Rule, pending judicial review, on October 9, 2015.

48.     On February 22, 2016, the Sixth Circuit ruled that it had exclusive jurisdiction to review challenges to the Rule pursuant to the Act's jurisdictional provision, 33 U.S.C. § 1369(b)(1). In response, the district court cases, for the most part, were held in abeyance or dismissed. On November 1, 2016, parties challenging the Rule filed opening merits briefs in the Sixth Circuit. On January 13, 2017, the Agencies filed a response brief vigorously defending the Rule.

49.     Also on January 13, 2017, the United States Supreme Court granted certiorari on the question whether district courts or circuit courts had original jurisdiction to consider challenges to the Clean Water Rule. The Sixth Circuit stayed further briefing pending the Supreme Court's resolution of that question.

50.     On January 22, 2018, the Supreme Court issued an opinion finding that jurisdiction over challenges to the Rule belonged in federal district courts.

<u>The Trump administration vilifies the Clean Water Rule</u>

51.     On February 28, 2017, President Trump signed an executive order requiring the Agencies to publish a proposed rule "rescinding or revising" the Clean Water Rule, "as appropriate and consistent with law." Exec. Order No. 13,778, § 2(a) (Feb. 28, 2017), published at 82 Fed. Reg. 12,497 (Mar. 3, 2017).

52.     President Trump has made numerous public statements disparaging the Clean Water Rule. For instance, on the same day that he signed the Executive Order he stated: "The EPA's regulators were putting people out of jobs by the hundreds of thousands, and regulations and permits started treating our wonderful small farmers and small businesses as if they were a major industrial polluter. They treated them horribly. Horribly." He went on to state: "If you want to build a new home, for example, you have to worry about getting hit with a huge fine if you fill in as much as a puddle—just a puddle—on your lot. I've seen it. In fact, when it was first shown to me, I said, no, you're kidding aren't you? But they weren't kidding."

53.     Administrator Pruitt has also pursued an unceasing public campaign against the Clean Water Rule, which began before the Rule was finalized.

54.     In March 2015, for instance, he co-authored an op-ed declaring that the Clean Water Rule would "strike the greatest blow to private property rights the modern era has seen," by "radically expand[ing] EPA jurisdiction" and "placing virtually all land and water under the heavy regulatory hand of the federal government." The op-ed claimed, falsely, that EPA's jurisdiction "has always been understood to include only large bodies of water capable of serving as pathways for interstate commerce."

55.     On the same day President Trump signed the executive order, Administrator Pruitt gave a speech to the American Farm Bureau Federation, a longtime opponent of the Rule, in which he said that "relief is on the way with respect to withdrawing the Waters of the United States Rule. It's already started." Pruitt claimed in the speech, falsely, that "puddles" are covered by the Rule. He said that EPA

15

was going to take "puddles – literally – and exercise jurisdiction over those areas." In fact, the Rule expressly exempts puddles. 33 C.F.R. § 328.3(b)(4)(vii).

56.     In a radio broadcast in July 2017, Administrator Pruitt repeated the falsehood that puddles are covered by the Clean Water Rule. He also claimed that implementation of the Rule had been confusing for landowners, even though the Rule had only been implemented for six weeks. He provided no evidence for this claim.

57.     In August 2017, Administrator Pruitt gave a televised interview in Iowa in which he claimed, falsely, that the Rule "would've covered 97 percent of the state of Iowa as a water of the United States."

58.     Administrator Pruitt has repeatedly said that EPA will repeal the Clean Water Rule, without indicating a willingness to consider preserving the Rule, or parts of it. For instance, in September 2017, the Administrator said during an appearance at the Concordia Annual Summit: "we're withdrawing the bad rule—the one in 2015." At an appearance at the Federalist Society, he said, "we're withdrawing the deficient rule from 2015. That process is ongoing—in fact, it's almost complete." And during a congressional oversight hearing in December 2017, when a congressperson gave Administrator Pruitt the chance to respond to critics who might say he has "already decided the outcome of the rule," the Administrator did not deny the charge, but answered by continuing to criticize the Rule.

59.     Additional evidence in the public record confirms that Administrator Pruitt is determined to repeal the Clean Water Rule and prevent it from being enforced.

60.     The New York Times has reported that, according to a former senior official in EPA's water office, Administrator Pruitt's deputies told EPA staff economists to produce an analysis that effectively negated the economic benefit of protecting wetlands. Wetlands' benefits constituted the bulk of the benefits which were previously calculated by EPA as flowing from the Clean Water Rule. The senior official was reported as saying: "This repeal process is political staff giving verbal directions to get the outcome they want, essentially overnight."

61.     This evidence, especially in the aggregate, shows that Administrator Pruitt has a closed mind with respect to the Clean Water Rule. He is determined to prevent the Rule from being implemented, and has made that a public commitment. He has given no indication that any evidence or argument could deter him from that path.

62.     Administrator Pruitt has not recused himself from Clean Water Rule rulemaking proceedings, including the suspension of the Rule for two years. Such proceedings, under his direction, had a predetermined result.

The Agencies suspend the Clean Water Rule

63.     On July 27, 2017, the Agencies published a proposal to repeal the Clean Water Rule and replace it with the previously existing regulatory text, which the Agencies would apply as "informed by applicable agency guidance documents and consistent with Supreme Court decisions and longstanding agency practice." 82 Fed. Reg. 34,899, 34,900 (July 27, 2017).

64.     The Agencies described repealing the Rule as the first step of a two-step process. Only later, at the second step, would they "conduct a substantive re-evaluation of the definition of 'waters of the United States.'" 82 Fed. Reg. at 34,899.

65.     Plaintiffs submitted public comments opposing the repeal. The Agencies had originally required comments by August 28, 2017, but in response to stakeholder requests for an extension, the Agencies extended the deadline to September 27, 2017. 82 Fed. Reg. 39,712 (Aug. 22, 2017). They received more than 680,000 comments.

66.     The repeal proposal has not been finalized.

67.     The Agencies then proposed, on November 22, 2017, to "add an applicability date" to the Rule of "two years from the date of final action on this proposal." 82 Fed. Reg. 55,542, 55,542 (Nov. 22, 2017). The Rule would be suspended until the applicability date was reached.

68.     The published proposal differed from the pre-publication version EPA had posted to its website. The pre-publication version proposed amending the "effective date" of the Rule, even though the Rule had already gone into effect on August 28, 2015.

69.     The Agencies limited public comment on the suspension proposal to an extremely short period of time. The proposal was published on November 22, which was the day before Thanksgiving. The comment period ended just three weeks later, on December 13. The Agencies received approximately 4,600 comments—a small fraction of what they received on the repeal proposal.

70.     The Agencies signed the final rule suspending the Clean Water Rule on January 31, 2018, and published it in the Federal Register on February 6, 2018. *Definition of "Waters of the United States" – Addition of an Applicability Date to 2015 Clean Water Rule*, 83 Fed. Reg. 5,200 (Feb. 6, 2018). The suspension rule amended the Code of Federal Regulations to provide that the Clean Water Rule is "applicable beginning on February 6, 2020." *Id.* at 5,208-09.

71.     The Agencies' stated purpose for the suspension is to provide "continuity and regulatory certainty" while they "consider possible revisions" to the Clean Water Rule. *Id.* at 5,200. According to the Agencies, two years will give them enough time to "finalize a rule with a new definition of 'waters of the United States.'" *Id.* at 5,206.

72.     The suspension rule does not formally enact any regulatory text that will govern in place of the Clean Water Rule. Until February 6, 2020, the Code of Federal Regulations will have no enforceable definition of the statutory term "waters of the United States." The Agencies claim they intend to implement the pre-Clean Water Rule regulations during this time, but only as those are "informed by" applicable agency guidance documents and "consistent with" Supreme Court decisions and "agency practice."

The suspension ignores the central issue at stake, has no rational basis, and precluded meaningful comment

73.     In suspending the Clean Water Rule the Agencies openly refused to address or to consider comments addressing the merits of the Rule being suspended, including the significant impact it will have on the nation's waterways and the people

who use and depend on them. The Agencies likewise ignored whether the approach they intend to follow for two years instead is good policy—or even reasonable—and did not address comments on that either. The Agencies ignored evidence demonstrating the significant, quantifiable benefits implementing the Clean Water Rule would have, even for one or two years—and thus ignored the significant, quantifiable costs of suspending the Rule. They did not disagree with the extensive economic, legal, and scientific justifications for the Rule, but claimed that, when deciding to suspend the Rule for two years in favor of a different regulatory regime, they were "under no obligation to address" such matters. 83 Fed. Reg. at 5,205.

74. The Agencies' only rationale for suspending the Clean Water Rule is that it will promote "continuity and regulatory certainty." *Id.* at 5,200. They claim that because the Rule could be stayed by district courts, and such stays may not be nationwide, the Agencies must preemptively suspend the Rule everywhere, for the sake of "certainty." *See id.* at 5,202.

75. The Agencies provided no reason why an interest in "regulatory certainty," even if valid, may be pursued at the expense of the objective of the Clean Water Act. When confronted with comments on this they responded only that the certainty they seek to achieve is "not inconsistent" with the Act's objectives, and "not the product of an improper balancing of applicable factors." *Id.* at 5,205. The Agencies did not elaborate on this position with evidence or explanation.

76. There is no record support for the rationale that the suspension will provide "certainty," and the claim is illogical.

77.     First, the Agencies point to no evidence that allowing the Rule to be implemented for some period of time, or for some part of the country, would create any problematic "uncertainty." The Rule was operative in 37 states for six weeks in 2015 before it was stayed. The Agencies provide no records, or even anecdotal evidence, that the Rule was confusing or difficult to administer during that time, or that the "uncertainty" of pending litigation had any detrimental impact on the regulated community or anyone else. In fact, the Agencies admit that they are unable to quantify any benefits as flowing from the supposed increase in "regulatory certainty."

78.     Second, the Agencies' proffered rationale is illogical. The suspension rulemaking itself creates the very same supposed "uncertainty" that the Agencies claim to be eliminating by enacting it. That is because the suspension of the Rule, like the Rule, is also subject to litigation. It, too, could be stayed or quickly overturned by a court, meaning the Rule would become operative again. The Agencies cannot control the outcome of litigation, and as long as litigation is pending, the operative rule at any given point will be "beyond the control of the agencies," 82 Fed. Reg. 34,899, 34,902. The Agencies cannot eliminate that fact by doing more rulemaking.

79.     The Agencies' rationale is illogical for another reason. Although they claim that the suspension rule "is designed to address [the] uncertainty" arising if "the scope of the Clean Water Act varies depending upon where a discharge may occur," 83 Fed. Reg. at 5,204, the Agencies intend to implement a regulatory regime that suffers from the same problem. Under the pre-2015 regulatory regime, because circuit courts interpret *Rapanos* differently, waters in some areas may be assessed only by reference to

Justice Kennedy's opinion in that case, whereas waters in other areas may be assessed by reference to *either* Justice Kennedy's opinion *or* the plurality opinion in that case. Plaintiffs identified in their comments how this undercuts the Agencies' rationale for imposing the pre-2015 regulatory regime, but the Agencies did not respond.

80. The record also makes clear, contrary to the Agencies' claims, that suspending the Clean Water Rule will *create* uncertainty, not alleviate it.

81. When the Agencies promulgated the Rule in 2015, they did so in part to promote clarity. The prior regulatory regime was characterized by confusion and inconsistency. The Rule addressed this problem by implementing clear, bright-line boundaries with respect to many categories of water. 80 Fed. Reg. 37,054, 37,054 (June 29, 2015) ("The rule will . . . increase [Clean Water Act] program predictability and consistency by clarifying the scope of 'waters of the United States' protected under the Act."); *id.* at 37,055 ("The rule will clarify and simplify implementation of the [Clean Water Act] consistent with its purposes through clearer definitions and increased use of bright-line boundaries to establish waters that are jurisdictional by rule and limit the need for case-specific analysis.").

82. The Agencies have now suspended the Clean Water Rule, and claim that implementing the prior regulatory regime—the one characterized by confusion and inconsistency—will actually promote certainty and clarity. But they do not rationally explain any disagreement with their own directly contrary and well-supported position from 2015.

83.     Moreover, by leaving no enforceable regulations on the books at all, the Agencies are necessarily injecting further confusion and inconsistency into enforcement and interpretation of the Clean Water Act. The government, regulated parties, citizens bringing enforcement actions, and the courts will need to determine whether a water is a "water of the United States" with no operative regulatory text to guide them.

84.     Alternatively, if the Agencies intend the pre-2015 regulatory regime—including the (unenacted) text, guidance documents, and so forth—to be binding law, they needed to provide clear notice of exactly what policies constitute that regime. Instead, the Agencies simply describe them vaguely as a combination of the former regulations, Supreme Court decisions, applicable guidance documents, and "agency practice." The Agencies needed to clearly state what they intend to enforce, and accept and consider public comments on those policies.

85.     Finally, the Agencies' suspension of the Clean Water Rule would, if endorsed, engender widespread regulatory uncertainty. The Agencies did not substantively justify the suspension, and have not allowed for meaningful public comment on it. Sanctioning this hasty maneuver to nullify a duly-promulgated rule that was the product of four years of agency effort and supported by a vast trove of documentary and scientific support would mean that any major regulation could be obliterated on a whim, without observation of the principles of administrative law that are intended to promote stability and continuity—such as the requirement to provide rational, record-supported explanations for policy changes, and meaningful public engagement. The Agencies' approach here would create regulatory whiplash.

## FIRST CLAIM FOR RELIEF

### *Violation of the Administrative Procedure Act:*
### *Arbitrary and Capricious Rulemaking*

86.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of the Complaint.

87.     The Agencies' amendment of the Clean Water Rule to add a new "applicability date" is a substantive rulemaking that must comply with the Administrative Procedure Act. The APA proscribes arbitrary and capricious rulemaking. 5 U.S.C. § 706(2)(A).

88.     A rulemaking is arbitrary and capricious if the agency failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

89.     In addition, a "reasoned explanation" is needed for an agency to disregard facts and circumstances that underlay a policy it is replacing, and the agency should at least "*believe*[] [the new rule] to be better," and have "good reasons" for it. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

90.     The Agencies adopted the Clean Water Rule in 2015 to promote regulatory clarity and consistency, and to protect the nation's waters in furtherance of the Clean Water Act's purpose. An extensive record supported the Rule's conclusion that it would promote both objectives.

91.     The Agencies' new "applicability date," which enacts a two-year suspension of the Rule, lacks a rational basis and reflects a failure to consider the single most important issue at stake in the rulemaking.

92.     In suspending the Clean Water Rule in service of an ultimate repeal, the Agencies refused to consider the substance of the Rule. They did not repudiate the findings and conclusions that underlay the Clean Water Rule. They did not express any substantive disagreement with the Rule, or address the foundation for the Rule, including the scientific evidence supporting its findings. The Agencies did not claim that the regulatory regime they intend to apply for two years is in any way preferable to the Rule—or that it is even reasonable.

93.     The Agencies thus failed to consider the most important issue at stake in the rulemaking: the relative substantive value of the Clean Water Rule versus the approach they will apply instead, including the impact of the suspension on the nation's waters.

94.     The only proffered basis for the suspension—regulatory continuity and certainty—has no record support, is illogical, and is contradicted by the evidence. The Agencies cannot identify any quantifiable benefits from the suspension.

95.     The suspension of the Clean Water Rule is inconsistent with the purposes of the Clean Water Act. It denies the public the protections and clarity of the Clean Water Rule for two years. And it leaves no enforceable regulations on the books— further undermining the Act itself and the "certainty" the Agencies claim the suspension will achieve.

25

96.     The Agencies do not explain why their concerns about "certainty," even if founded, may be pursued at the expense of the purposes of the Act.

97.     The suspension of the Clean Water Rule for two years is thus "arbitrary," "capricious," an "abuse of discretion," and "not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### *Violation of Due Process Clause and Administrative Procedure Act: Failure to Provide Meaningful Opportunity for Comment*

98.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of the Complaint.

99.     The Administrative Procedure Act requires agencies to provide public notice of a proposed rulemaking, give interested persons an opportunity to participate in the rulemaking by submitting comments, and consider the relevant comments submitted. 5 U.S.C. § 553(b), (c). The opportunity for comment during an agency rulemaking must be meaningful. Among other things, rulemakings must be undertaken with an open mind on the part of the agency, and there must be enough time to comment and for the agency to consider and respond to the comments.

100.    The Agencies' amendment of the Clean Water Rule to add a new "applicability date" is a rulemaking that must comply with these notice and comment requirements.

101.    The Due Process Clause of the Constitution also requires rulemakings to be undertaken with an open mind. *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170

(D.C. Cir. 1979). Decisionmakers violate the Due Process Clause and must be disqualified when they act with an unalterably closed mind and are unwilling to rationally consider arguments. *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011).

102.    The Agencies did not provide a meaningful opportunity to comment on the proposed suspension of the Clean Water Rule.

103.    They unreasonably circumscribed the substance of the public's comments, and refused to consider comments that addressed the single most important issue at stake: whether it was good policy, or even rational, to suspend the Clean Water Rule for two years and instead implement the prior regulatory regime.

104.    The Agencies also provided an unreasonably short time period in which to comment. They spent an unreasonably short time responding to those comments, and did not meaningfully respond to many of them.

105.    The Agencies also did not provide a meaningful opportunity to comment on the suspension because they did not clearly describe the policies they intend to implement during the two-year suspension period, making comment on such policies nearly impossible.

106.    Additionally, if the Agencies intend to treat those pre-2015 policies as binding rules during the suspension period, they must undertake a full rulemaking to adopt those policies, including providing notice and an opportunity for comment on their substance.

27

107.     The Agencies also prevented the public from having a meaningful opportunity to comment by masking the true effect of the suspension: they repeatedly claimed that the addition of an "applicability date" would maintain the *status quo*—when in fact the *status quo* was that the Clean Water Rule was the law on the books, without any applicability date.

108.     The Agencies did not provide a meaningful opportunity to comment, and also violated the Due Process Clause requirement for fair process, because the head decisionmaker at EPA, Administrator Pruitt, had an unalterably closed mind with respect to the outcome of the suspension proceeding.

109.     The suspension of the Clean Water Rule for two years was therefore promulgated in violation of the Due Process Clause of the U.S. Constitution, and was "without observance of procedure required by law" and "contrary to constitutional right" in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(B), (D).

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.     Declare that Defendants are each in violation of the Administrative Procedure Act as described above;

2.     Declare that defendant EPA is in violation of the U.S. Constitution as described above;

3.     Vacate the suspension rulemaking titled, *Definition of "Waters of the United States" – Addition of an Applicability Date to 2015 Clean Water Rule,* 83 Fed Reg. 5,200;

4.      Grant Plaintiffs their costs of suit including reasonable attorney fees to the

extent permitted by law; and

5.      Grant Plaintiffs such further relief as is necessary and appropriate.


Dated: February 6, 2018                         Respectfully submitted,

                                                /s/ Catherine M. Rahm____
                                                Catherine Marlantes Rahm
                                                Natural Resources Defense Council
                                                40 West 20th Street
                                                New York, NY 10011
                                                Phone: (212) 727-4628
                                                E-mail: crahm@nrdc.org

                                                Jennifer A. Sorenson
                                                *Pro Hac Vice motion pending*
                                                Natural Resources Defense Council
                                                111 Sutter Street, 21st Floor
                                                San Francisco, CA 94104
                                                Phone: (415) 875-6164
                                                E-mail: jsorenson@nrdc.org