# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NATURAL RESOURCES
DEFENSE COUNCIL, INC.; and

NATIONAL WILDLIFE
FEDERATION,

      Plaintiffs,

v.

ENVIRONMENTAL
PROTECTION AGENCY; et al.,

      Defendants.

Case No. 18-cv-1048 (JPO)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION
TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT.......................................................................................................................2

I.      The Suspension Rule is arbitrary and capricious ........................................................2

        A.      The Agencies ignored the Clean Water Rule's merits ...................................2

        B.      The Agencies' only rationale lacks support and contradicts the record.....11

II.     The public lacked a meaningful opportunity to comment .......................................14

III.    Former Administrator Pruitt's mind was closed about the Suspension Rule .......18

IV.     The Suspension Rule should be vacated ..................................................................22

CONCLUSION ................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Abington Mem'l Hosp. v. Heckler*,
     750 F.2d 242 (3d Cir. 1984) ........................................................................... 33

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
     713 F.2d 795 (D.C. Cir. 1983) ...................................................................... 26

*Alaska Factory Trawler Ass'n v. Baldridge*,
     831 F.2d 1456 (9th Cir. 1987) ...................................................................... 21

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
     988 F.2d 146 (D.C. Cir. 1993) ................................................................. 24, 26

*Allina Health Servs. v. Sebelius*,
     746 F.3d 1102 (D.C. Cir. 2014) ............................................................... 17, 26

*California Communities Against Toxics v. EPA*,
     688 F.3d 989 (9th Cir. 2012) ........................................................................ 31

*California v. Bureau of Land Mgmt. (BLM II)*,
     286 F. Supp. 3d 1054 (N.D. Cal. 2018) .......................................................... 3

*California v. U.S. Bureau of Land Mgmt. (BLM I)*,
     277 F. Supp. 3d 1106 (N.D. Cal. 2017) ............................................. 25, 26, 27

*Coeur Alaska, Inc. v. S.E. Alaska Conservation Council*,
     557 U.S. 261 (2009) ...................................................................................... 23

*Dubois v. U.S. Dep't of Agric.*,
     102 F.3d 1273 (1st Cir. 1996) ....................................................................... 12

*Envtl. Def. Fund, Inc. v. Adm'r, EPA*,
     898 F.2d 183 (D.C. Cir. 1990) ...................................................................... 24

*Envtl. Def. Fund, Inc. v. Gorsuch*,
     713 F.2d 802 (D.C. Cir. 1983) ........................................................................ 3

*FCC v. Fox Television Stations, Inc.*,
     556 U.S. 502 (2009) ................................................................................ 13, 25

*FCC v. NextWave Personal Comm'cns Inc.*,
    537 U.S. 293 (2003) .................................................................... 22, 23

*Guertin v. United States*,
    743 F.3d 382 (2d Cir. 2014) ....................................................... 22

*International Snowmobile Manufacturers Ass'n v. Norton*,
    340 F. Supp. 2d 1249 (D. Wyo. 2004) ....................................... 21

*Kaytor v. Elec. Boat Corp.*,
    609 F.3d 537 (2d Cir. 2010) ....................................................... 20

*L.A. Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ..................................................... 22

*Lead Indus. Ass'n v. EPA*,
    647 F.2d 1130 (D.C. Cir. 1980) ................................................. 21

*Miss. Comm'n on Envtl. Quality v. EPA*,
    790 F.3d 138 (D.C. Cir. 2015) ................................................... 21

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .................................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................. 8, 12

*N.C. Growers' Ass'n v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ............................................. *passim*

*Nat'l Venture Capital Ass'n v. Duke*,
    291 F. Supp. 3d 5 (D.D.C. 2017) ...................................... 4, 22, 25

*Nehemiah Corp. of America v. Jackson*,
    546 F. Supp. 2d 830 (E.D. Cal. 2008) ....................................... 21

*North Carolina v. EPA*,
    550 F.3d 1176 (D.C. Cir. 2008) ................................................. 24

*NRDC v. EPA*,
    683 F.2d 752 (3d Cir. 1982) ...................................................... 3

*NRDC v. EPA,*
    808 F.3d 556 (2d Cir. 2015) ............................................................... 24

*NRDC v. Nat'l Highway Traffic Safety Admin.,*
    894 F.3d 95 (2d Cir. 2018) ....................................................... *passim*

*Ohio Valley Envtl. Coalition v. Aracoma Coal Co.,*
    556 F.3d 177 (4th Cir. 2009) .............................................................. 23

*Paulsen v. Daniels,*
    413 F.3d 999 (9th Cir. 2005) ........................................................ 15, 26

*Perez v. Mortg. Bankers Ass'n,*
    135 S. Ct. 1199 (2015) ...................................................................... 18

*Pub. Citizen, Inc. v. Mineta,*
    340 F.3d 39 (2d Cir. 2003) ................................................................ 10

*Pub. Emps. for Envtl. Responsibility (PEER) v. U.S. Fish & Wildlife Serv.,*
    189 F. Supp. 3d 1 (D.D.C. 2016) ................................................... 27, 30

*S.E. Alaska Conservation Council v. U.S. Army Corps of Eng'rs,*
    486 F.3d 638 (9th Cir. 2007) .............................................................. 23

*Shands Jacksonville Med. Ctr. v. Burwell,*
    139 F. Supp. 3d 240 (D.D.C. 2015) ............................................ 17, 24, 26

*Sharon Steel Corp. v. EPA,*
    597 F.2d 377 (3d Cir. 1979) ............................................................... 24

*Stand Up for California! v. U.S. Dep't of Interior,*
    No. 1:17-CV-00058, 2018 WL 2433576 (D.D.C. May 30, 2018) .......... 19, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    282 F. Supp. 3d 91 (D.D.C. 2017) ...................................................... 28

*Sugar Cane Growers Coop. of Florida v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002) .............................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) .......................................................................... 20

*United States v. Donovan*,
    661 F.3d 174 (3d Cir. 2011) ...................................................................... 14

*Va. Soc'y for Human Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ..................................................................... 22

## STATUTES

5 U.S.C. § 706(2) ............................................................................................... 23

5 U.S.C. § 706(2)(A) .......................................................................................... 22

5 U.S.C. § 706(2)(D) .......................................................................................... 22

33 U.S.C. § 1251(a) .............................................................................................. 3

33 U.S.C. § 1370 .......................................................................................... 12, 27

## REGULATIONS

33 C.F.R. § 328.3(b)(3)(i) ................................................................................. 29

33 C.F.R. § 328.3(b)(6) ..................................................................................... 30

33 C.F.R. § 328.3(c)(5) ...................................................................................... 31

*Clean Water Rule: Definition of "Waters of the United States"; Final Rule*,
    80 Fed. Reg. 37,054 (June 29, 2015) .................................................. *passim*

*Definition of "Waters of the United States" – Recodification of Pre-Existing Rules;*
    *Proposed Rule*,
    82 Fed. Reg. 34,899 (July 27, 2017) ........................................................ 34

*Definition of "Waters of the United States" – Addition of an Applicability Date to*
    *2015 Clean Water Rule; Proposed Rule*,
    82 Fed. Reg. 55,542 (Nov. 22, 2017) ....................................................... 16

*Definition of "Waters of the United States" – Recodification of Preexisting Rule*
    83 Fed. Reg. 32,227 (July 12, 2018) .................................................... *passim*

*Definition of "Waters of the United State" – Addition of an Applicability Date to*
    *2015 Clean Water Rule; Final Rule,*
    83 Fed. Reg. 5,200 (Feb. 6, 2018) ........................................................................... *passim*

## OTHER AUTHORITIES

*Economic Analysis of the EPA-Army Clean Water Rule, available at*
    https://www.epa.gov/sites/production/files/2015-06/documents/508-
    final_clean_water_rule_economic_analysis_5-20-15.pdf. ....................................... 10

*Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993)* .................................................... 16

## INTRODUCTION

In suspending the Clean Water Rule, the Environmental Protection Agency and Army Corps of Engineers flouted the Administrative Procedure Act (APA) and its bedrock requirements of reasoned rulemaking and public participation. The purpose of the Clean Water Rule was to specify where the pollution controls of the Clean Water Act apply. But the Agencies suspended that Rule for two years while refusing to consider the suspension's impact on water pollution. The only rationale the Agencies provided for the suspension—that it would supposedly promote "clarity"—not only lacks support but also contradicts the evidence in the record. The pre-Clean Water Rule policies that the Agencies are now implementing in light of the Suspension Rule are neither clear nor predictable, which is why the Agencies issued the Clean Water Rule to begin with. The Suspension Rule is irrational and violates the APA.

The Agencies also violated the APA's notice-and-comment requirements. They refused to consider comments on the merits of the rule they were suspending; they allowed only 21 days for comment—one-third of the usual minimum time—without demonstrating any emergency to justify that sharp curtailment; and they masked the true effects of the Suspension Rule, potentially misleading would-be commenters.

The Agencies further violated the APA and the Due Process Clause because then-EPA Administrator Scott Pruitt had an unalterably closed mind regarding the Clean Water Rule and its suspension. Pruitt's denigrations of the Clean Water Rule were incessant, extreme, and persisted for years—he was determined to suspend the Rule so that it would not become enforceable. If Plaintiffs' evidence is not enough to

1

demonstrate an unalterably closed mind, the APA and Due Process Clause standards in this regard would be stripped of meaning, because it is unclear what could satisfy them.

Apparently recognizing the strength of Plaintiffs' claims against the Suspension Rule, Defendants and defendant-intervenors (hereafter, "Industry Groups") devote significant space—for the Industry Groups, practically their entire brief—to an argument that the Suspension Rule, even if unlawful, should not be vacated. But vacatur is the standard remedy for APA violations and is the only appropriate remedy here. Remand without vacatur would give the Agencies precisely the illegal result they sought: namely, more time to try to finalize a repeal of the Clean Water Rule—which would otherwise be the law—without either enforcing it or explaining why they will not do so. The Suspension Rule is unlawful and it must be vacated.

## ARGUMENT

## I.     The Suspension Rule is arbitrary and capricious

### A.     The Agencies ignored the Clean Water Rule's merits

It was not rational, and violated the APA, for the Agencies to suspend the Clean Water Rule without considering the Rule's substantive merits. As a result of the suspension, for the next two years fewer streams and wetlands will benefit from the pollution-control protections of the Clean Water Act. *See* Pls.' Opening Br. 13-14, ECF No. 55. When issuing the Clean Water Rule, the Agencies found, based on an extensive scientific record, that these streams and wetlands significantly affect water quality in downstream water bodies, such as lakes and rivers. *E.g.*, 80 Fed. Reg. 37,054, 37,055 (June 29, 2015). Yet when the Agencies suspended the Clean Water Rule, they did not

2

devote a single sentence to the effects on water quality, even though improved water quality is the specific objective of the Clean Water Act, 33 U.S.C. § 1251(a). Indeed, the Agencies refused to consider that issue. That was irrational and unlawful. *See N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 761, 769-70 (4th Cir. 2012); *California v. Bureau of Land Mgmt.* (*BLM II*), 286 F. Supp. 3d 1054, 1058-59, 1072 (N.D. Cal. 2018).

Defendants contend that the merits of the Clean Water Rule are "irrelevant" and that there was "no reason" for the Agencies to consider them. Defs.' Br. 33, ECF No. 90. According to Defendants, the Agencies would only have needed to consider the merits of the Clean Water Rule if they had "substantively change[d] or repeal[ed] that Rule." *Id.* at 34. But suspending the Clean Water Rule for two years *is* a substantive change to the Rule. *See NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 113 (2d Cir. 2018) ("[A]ltering the effective date of a duly promulgated standard could be, in substance, tantamount to an amendment or rescission of the standards." (quoting *NRDC v. Abraham*, 355 F.3d 179, 194 (2d Cir. 2004))).

For two years, decisions about which water bodies are "waters of the United States" will be governed by a set of policies that is different from the Rule. That is a substantive change in the law. *Cf. Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 818 (D.C. Cir. 1983) (suspension of hazardous waste regulations had a "substantive effect on the obligations of the owners of existing facilities and on the rights of the public"); *NRDC v. EPA*, 683 F.2d 752, 763 (3d Cir. 1982) (suspension of toxic waste regulations postponed industry's obligation to comply with the standards, "and therefore had a substantial impact upon both the public and the regulated industry"). The significance

of the suspension is heightened by the fact that the Agencies intend for it to last until they repeal the Rule, rendering the suspension their first step in an attempted repeal. 83 Fed. Reg. 5,200, 5,206 (Feb. 6, 2018) ("The agencies selected the two-year time period as a reasonable time period within which to finalize a rule with a new definition of 'waters of the United States.'"); *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 14 (D.D.C. 2017) ("By using this Delay Rule to bridge the gap to rescission, the agency has effectively erased—rather than delayed—the benefit of the [existing] Final Rule.").

By refusing to consider the merits of the Clean Water Rule, the Agencies "ignored important aspects of the problem" and violated the APA, as the Fourth Circuit concluded on parallel facts in *North Carolina Growers*, 702 F.3d at 769-70. That case is remarkably similar to this one: The Department of Labor suspended a rule for nine months, pending a rulemaking to replace the rule. In the interim, the Department reinstated the prior rule, and, in so doing, expressly refused to consider "the merits of either set of regulations"—the rule it was suspending or the prior rule. *Id.* at 761. The Fourth Circuit held that that was unlawful. *Id.* at 769-70.

Defendants fail in their attempts to distinguish *North Carolina Growers*. Whether the Clean Water Rule was being implemented at the time it was suspended has no bearing on whether the suspension effected a substantive change in the law. *Contra* Defs.' Br. 24. Absent the Suspension Rule, the Clean Water Rule would have taken effect in 37 states when the Sixth Circuit dissolved its stay in February, which the Agencies of course understood, *see* 83 Fed. Reg. at 5,202. By suspending the Rule, the Agencies changed the law in those states for two years, without considering how that change

4

would affect the health of water bodies and the public interest in clean water. Over the past three years, the Army Corps of Engineers has assessed the jurisdictional status of more than 30,000 water bodies. *See* 83 Fed. Reg. 32,227, 32,228 (July 12, 2018). Even taking the pending district court injunctions into account, the Suspension Rule will thus likely impact the assessment of Clean Water Act coverage for many thousands of waters. For the Agencies to ignore that significant, substantive impact was not rational.

Additionally, Defendants attempt to distinguish *North Carolina Growers* by arguing that, there, the merits of the suspended regulation were "integral to the proposed agency action and the conditions that action sought to alleviate," Defs.' Br. 25 (quoting *North Carolina Growers*, 702 F.3d at 769-70), whereas here, according to Defendants, the merits of the Clean Water Rule are not "relevant to the discrete question before [the Agencies], *i.e.*, how to best promote consistency, predictability, and uniformity," *id.* But the Agencies cannot avoid considering the substantive effect of their rulemaking by announcing that the substantive effect of their rulemaking is not their focus, and artificially confining their review to "consistency" concerns. The Clean Water Rule's central purpose was to clarify where the pollution limits of the Clean Water Act apply. For the Agencies to alter where those pollution limits apply, for two years, without considering the effects on water quality and while asserting that the action had nothing to do with water quality, is absurd. It is the height of irrationality.

Moreover, it is simply not true that, even according to the Agencies, the merits of the Clean Water Rule were "irrelevant" to the Suspension Rule. It is obvious that the current administration's antipathy for the substance of the Clean Water Rule motivated

the suspension. The prior administration saw no obstacle to enforcing the Rule in 37 states while it was enjoined in 13 states. Indeed, in 2015 the Agencies sought to limit the injunction to 13 states, leaving them to implement the Rule elsewhere—which they proceeded to do, apparently without incident, for six weeks. Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts (PSUMF) ¶ 15, ECF No. 56. The Agencies' brand-new position, that it is undesirable to implement the Rule in some states but not others, is unsupported and clearly rooted in the current administration's substantive disagreement with the Rule. *See, e.g.*, 83 Fed. Reg. 32,227, 32,228 (July 12, 2018) (supplemental proposal to repeal the Clean Water Rule, describing the Agencies' current disagreement with the Rule's substance). In short, nothing is more "relevant" to the Suspension Rule than the merits of the Clean Water Rule it suspends.[1]

Perhaps recognizing the Agencies' error, Defendants also try to rewrite history by arguing that the Agencies did consider whether implementing the Clean Water Rule or the prior regulatory regime was "the comparatively better policy." Defs.' Br. 34. That is untrue. The Agencies only purported to consider which policy would best promote "continuity and certainty." 83 Fed. Reg. at 5,200. The Agencies expressly did *not* consider which policy would better implement the Clean Water Act, or abide by

---

[1] Defendants' final attempt to distinguish *North Carolina Growers* also fails. Defendants argue that, there, agricultural employers relied on the suspended rule to plan for the growing season, whereas here, according to Defendants, no parties have demonstrated reliance interests in the Clean Water Rule. Defs.' Br. 24-25. But even if that were true, the Fourth Circuit made no mention of reliance interests in concluding that the agency "ignored important aspects of the problem" when it failed to consider the merits of the rule it was suspending. 702 F.3d at 769-70. This makes sense. Reliance interests are not a prerequisite for the application of bedrock APA principles.

Supreme Court precedent, or reflect the science on streams and wetlands, or protect the nation's waters and public health. In fact, the Agencies insisted they were "under no obligation to address the merits of the 2015 Rule because the addition of an applicability date to the 2015 Rule does not implicate the merits of that rule." *Id.* at 5,205.

Not only did the Agencies ignore the environmental and public-health benefits of the Clean Water Rule when they suspended it for two years, but Defendants' counsel now misleadingly suggests that there may not have been any "environmental impact" to consider. According to the Agencies' brief, the Rule narrowed the application of the Clean Water Act as compared to the prior regulations. Defs.' Br. 36-38. But Defendants' counsel either misunderstands or is trying to obfuscate a critical difference between, on the one hand, the *text* of the 1986 regulations and, on the other hand, the Agencies' *application* of those regulations in the wake of *Solid Waste Agency of Northern Cook County (SWANCC) v. United States Army Corps of Engineers*, 531 U.S. 159 (2001), and *Rapanos v. United States*, 547 U.S. 715 (2006). This application constitutes the "pre-Rule regulatory regime." The text of the 1986 regulations gave the Clean Water Act a broad reach, while the pre-Rule regulatory regime narrowed it—and muddled it—significantly. *See* Pls.' Opening Br. 2-5. The Clean Water Rule occupied a middle ground between the two: It was "environmentally more protective" than the pre-Rule regulatory regime, 80 Fed. Reg. at 37,057; *see id.* at 37,056, but was "narrower" than the text of the preexisting regulation, *id.* at 37,054.[2]

---

[2] This improper conflation also explains the incorrect statement in Defendants' brief that the permitting regime applicable under the Suspension Rule was applied "for four

In fact, just this month the Agencies stated that the Clean Water Rule covered more waters than were regulated "under the preexisting regulations, as applied by the agencies following decisions of the Supreme Court in *Rapanos* and [*SWANCC*]." 83 Fed. Reg. at 32,228. For the Agencies to claim in their brief, in stark contrast, that the Clean Water Rule is not more protective of streams and wetlands than the pre-Rule regulatory regime—such that they were supposedly not required to consider the Rule's environmental benefits when suspending it—is therefore disingenuous. And, of course, post hoc rationalizations in the Agencies' brief cannot in any event substitute for a reasoned analysis at the time of the suspension. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The Agencies never said, when suspending the Rule, that they did not need to consider its environmental benefits because the suspension would result in more environmental protections.

The Suspension Rule is also irrational, and violated the APA, because the Agencies adopted an improper "baseline" for purposes of their economic analysis. The Agencies chose to analyze the impact of the Suspension Rule as compared to the Sixth Circuit's nationwide stay of the Rule. Unsurprisingly, they concluded that suspending a Rule that is stayed would have no costs. *See* Knicley Decl. Ex. 17 at 2-5, ECF No. 57-17. But that baseline was illogical: The Agencies knew perfectly well that the Sixth Circuit was about to dissolve its stay, because the Supreme Court had ruled in January 2018

---

decades" before the Clean Water Rule. Defs.' Br. 2. In fact, the regulatory regime in place now has only been in place since 2008, when the Agencies issued their second of two "guidance documents," in the wake of *Rapanos*.

that the circuit court lacked jurisdiction. *See id.* at 4. That is precisely why the Agencies suspended the Rule, and it is transparently why they rushed it through on February 6, 2018—to preempt the Sixth Circuit's inevitable dissolution of the stay in light of the Supreme Court's decision. *See also* 83 Fed. Reg. at 5,200 (claiming the suspension "is necessary in light of the Supreme Court's decision"). Thus, the Agencies should have evaluated the impact of suspending the Rule by comparing the suspension to a scenario in which the Rule was enforceable in the 37 states not covered by the North Dakota district court's 2015 injunction. Absent additional court orders, that would have been the state of affairs by the end of February 2018, were it not for the Suspension Rule.

Again resorting to post hoc rationalizations, Defendants' counsel argues that the "Agencies reasonably determined that there are no forgone benefits or 'costs' that could result from partial application of the 2015 Rule." Defs.' Br. 36; *see id.* at 39-40. (Presumably, what this sentence was supposed to say is that the Agencies found no forgone benefits or costs could result from *suspending* partial application of the Rule.) But the Agencies did not actually analyze the forgone benefits or costs of suspending partial application of the Rule. Instead, they simply rejected the idea of using implementation of the Rule as the baseline for analysis, and did not even consider comparing the suspension of the Rule to the partial implementation of the Rule. Knicley Decl. Ex. 17 at 5. They chose instead to compare suspending the Rule to the Sixth Circuit's about-to-expire stay of the Rule, *id.* at 3-5, and concluded that in "light of" that baseline, the suspension is expected to result in no costs and "unquantifiable benefits,"

*id.* at 5. That choice was irrational, and Defendants cannot cure the irrationality by pretending the Agencies conducted an analysis they did not.[3]

The Agencies refer in a generic sense to what they consider the "costs" of partial implementation of the Rule, such as "regulatory complexity." *See* Defs.' Br. 36 (citing 83 Fed. Reg. at 5,202); Knicley Decl. Ex. 17 at 4 (speculating that the suspension "could" reduce uncertainty, though acknowledging that uncertainty "may persist"). But the Agencies never purported to weigh those supposed "costs" of partially implementing the Rule against the *benefits* of partially implementing the Rule—such as the substantial, quantifiable benefits that come from better protecting wetlands, 80 Fed. Reg. at 37,101 (estimating the Rule's quantifiable benefits as ranging from $339 to $572 million annually).[4] *See also* Institute for Policy Integrity Amicus Br. 11-12, ECF No. 71-1 (explaining that data in the record were sufficient to calculate an estimate of the forgone benefits from suspending the Rule in just the 37 states where it was not enjoined). The Agencies' failure to consider the costs of suspending the Rule, or partial application of the Rule, was irrational. *See Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 58, 62 (2d Cir. 2003) (vacating a rule as arbitrary and capricious where the rulemaking record "does not

---

[3] Likewise, Defendants' statement that the "Agencies did explicitly consider" the forgone benefits of wetland protection from suspending the Rule, Defs.' Br. 39, is simply untrue. What the Agencies did was explicitly decide *not* to consider the forgone benefits of wetland protection—or any other benefit from the Clean Water Rule. Knicley Decl. Ex. 17 at 5. That is the opposite of "explicitly consider[ing]" such effects.

[4] *See* Economic Analysis of the EPA-Army Clean Water Rule 43-54, 71-73, *available at* https://www.epa.gov/sites/production/files/2015-06/documents/508-final_clean _water_rule_economic_analysis_5-20-15.pdf.

explain why the costs saved were worth the benefits sacrificed").

**B.  The Agencies' only rationale lacks support and contradicts the record**

Instead of considering the substance of the Clean Water Rule, the Agencies offered only a single rationale for its suspension: they said it would promote "continuity and regulatory certainty." 83 Fed. Reg. at 5,200. The Agencies claimed that it would be "complicated and inefficient" to enforce the Clean Water Rule in some states while the Rule was judicially enjoined in others. *Id.* at 5,202. But this rationale lacks support and is contrary to the evidence in the record, and so violates the APA.

As explained in Plaintiffs' opening brief, no evidence supports the notion that enforcing the Clean Water Rule in some states and not others would be "complicated and inefficient." Pls.' Opening Br. 15-16. The Agencies enforced the Rule in 37 states for six weeks in the fall of 2015, and they have produced no evidence that this non-nationwide regulatory regime caused any problems, either for them or for regulated industries. In fact, as noted above, the Agencies themselves had urged the North Dakota district court to limit its injunction to 13 states, which allowed the Agencies to enforce the Rule in the remaining 37. PSUMF ¶ 15.

Defendants offer no response to this argument. Instead, they simply quote the Agencies' conclusion that "[h]aving different regulatory regimes in effect throughout the country would be complicated and inefficient for both the public and the agencies," Defs.' Br. 32 (quoting 83 Fed. Reg. at 5,202), and pronounce that conclusion "logical," *id.* But an assertion by counsel that something is "logical" does not satisfy the APA. The Agencies had to "examine the relevant data and articulate a satisfactory explanation"

11

for the Suspension Rule, including "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). Here, the Agencies never mentioned, much less analyzed, the impacts of non-nationwide enforcement of the Rule during 2015. Nor did they give a single, concrete reason why non-nationwide enforcement of the Rule would be "complicated and inefficient."

In fact, the Agencies' single-minded pursuit of national uniformity in the definition of "waters of the United States" is unreasonable because the Clean Water Act does not place a premium on nationwide uniformity. The Act assumes there will be some state-level variation, by expressly allowing states to regulate water quality more stringently than federal standards. *See* 33 U.S.C. § 1370; *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1300 (1st Cir. 1996) ("Simply put, the [Clean Water Act] provides a federal floor, not a ceiling, on environmental protection.").

The Agencies' position that the suspension will create "clarity," 83 Fed. Reg. at 5,202, also contradicts the evidence in the record. The pre-Rule regulatory regime was confusing and led to inconsistent outcomes, because it relied heavily on site-specific analyses to determine whether water bodies were protected by the Clean Water Act. *See* Pls.' Opening Br. 16 (citing 80 Fed. Reg. at 37,056). The Agencies addressed this problem in the Clean Water Rule by making more waters subject to bright-line tests that categorically include or exclude them from the Act's coverage. 80 Fed. Reg. at 37,054-55. Now the Agencies have reversed course, without explaining why they no longer agree with their earlier conclusion that the Clean Water Rule is clearer and easier to apply

than the pre-Rule regime, and without providing any evidence that the pre-Rule regime led to predictable or consistent outcomes.

Defendants contend that the Agencies adequately addressed this issue, Defs.' Br. 32-33, but that is untrue. The Agencies simply *said* that they "disagree[d]" that the suspension would increase uncertainty, citing their experience in implementing the pre-Rule regime. 80 Fed. Reg. at 5,204. That bald conclusion is not enough. "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). The Agencies had extensive experience implementing the pre-Rule regime when they issued the Clean Water Rule, too, *see* 80 Fed. Reg. at 37,065, and they found that "this time and resource intensive process can result in inconsistent interpretation of [Clean Water Act] jurisdiction and perpetuate ambiguity over where the [Act] applies," *id.* at 37,056. The Agencies identified a "compelling need for clearer, more consistent, and easily implementable standards to govern administration of the Act, including brighter line boundaries where feasible and appropriate." *Id.* at 37,057. In reversing course, the Agencies did not provide any explanation—let alone a reasonable one—for disregarding these prior findings.

Defendants imply that the Clean Water Rule cannot deliver "clarity" if it is not enforced nationwide. Defs.' Br. 1; *see id.* at 17-18, 24. They quote the Agencies' assertion that "the proper comparison is not to a regulatory regime that never existed—nationwide implementation of the 2015 Rule—but rather to the uncertainty that the agencies have identified as a reasonable concern: Different definitions of [WOTUS] . . .

in various [jurisdictions]." *Id.* at 23-24 (quoting 83 Fed. Reg. at 5,204); *see also id.* at 33. But even if the Clean Water Rule cannot be implemented nationwide, it can still provide clarity where it *is* implemented. Here, the Agencies' choice was between (1) implementing a clear rule in some states and a confusing set of policies in others, or (2) applying a confusing set of policies everywhere. The Agencies chose the latter, even though it is self-evident that the first option will produce *more* "clarity," because at least the rule will be clear in states where the Clean Water Rule is enforced. Moreover, the pre-Rule regime does not—as the Agencies imply—result in consistent standards nationwide, because circuit courts differ in their interpretation of the *Rapanos* decision. *See United States v. Donovan*, 661 F.3d 174, 181–82 (3d Cir. 2011).[5]

Because the Agencies' only rationale for the suspension lacks evidentiary support, is unexplained, and contradicts the evidence in the record, the Suspension Rule violates the APA and must be vacated.

## II.   The public lacked a meaningful opportunity to comment

The Agencies further violated the APA by depriving the public of a meaningful opportunity to comment on the proposed suspension of the Clean Water Rule. The Agencies unreasonably circumscribed the content of the comments, provided an unreasonably short time in which to comment, and masked the true effect of the Suspension Rule, potentially misleading commenters.

---

[5] The Agencies cannot seriously claim that it would be unclear where the Rule applies if it were enforced only in states not subject to an injunction. Knowing whether the Rule applied in a given state would just require knowing (1) where it had been enjoined and (2) what state you were in.

The Agencies' refusal to consider comments on the merits of the Clean Water Rule was not only arbitrary and capricious, *see supra* pp. 2-11, but also violated the APA's notice-and-comment requirements. *North Carolina Growers*, 702 F.3d at 770. Defendants argue that the Agencies considered *whether* to consider the merits of the Clean Water Rule, and decided not to (until a later rulemaking). *See* Defs.' Br. 21-22. But deciding not to address something is not the same as addressing it. The Agencies' decision to ignore the substance of the Rule they were suspending was unlawful, and it was likewise unlawful for the Agencies to refuse to consider public comments on the impacts of suspending the Rule for two years, including impacts on water quality.

Deferring those issues to a later rulemaking does not solve the problem, contrary to Defendants' suggestion, *see* Defs.' Br. 34 n.13 (claiming that Plaintiffs can have their views heard on these issues during a different rulemaking). The Agencies should have reviewed the environmental impacts of the two-year suspension *before* suspending the rule and incurring such impacts—not afterward. *See NRDC*, 894 F.3d at 115 ("An agency may not promulgate a rule suspending a final rule and then claim that post-promulgation notice and comment procedures cure the failure to follow, in the first instance, the procedures required by the APA."); *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005) ("It is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later.").

Additionally, the Agencies violated the APA by allowing just 21 calendar days for comment on the proposed suspension, including Thanksgiving. In response, Defendants argue that the opportunity for comment need only be "meaningful," and

that the APA does not specify any minimum length for a comment period. Defs.' Br. 26. True, but Executive Order 12,866 instructs agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days." Exec. Order No. 12,866 § 6(a)(1), 58 Fed. Reg. 51,735 (Oct. 4, 1993). Here, the comment period was roughly a third of the presumptive minimum length, and the Agencies offered no compelling reason for deviating from that minimum. Defendants point to the "narrowly tailored" scope of the rulemaking, Defs.' Br. 26 (quoting 83 Fed. Reg. at 5,205), but, as explained above, the artificially narrowed scope of the rulemaking was itself illegal. *See North Carolina Growers*, 702 F.3d at 772 (Wilkinson, J., concurring) (criticizing the "highly abbreviated comment period allowed for what was, in reality, a complicated matter involving widespread real-world impacts"). Defendants argue that the Agencies had to act quickly because "possible . . . vacatur of the nationwide injunction" was "imminent," Defs.' Br. 26-27, but they have no answer to the fact that the alleged urgency was caused solely by their own delay in proposing the Suspension Rule, *see* Pls.' Opening Br. 19. *Cf. NRDC*, 894 F.3d at 114 ("Any imminence was [the agency's] own creation.").

Finally, the Agencies masked the effect of the suspension by claiming that the addition of an "applicability date" was a ministerial action that simply "maintain[ed] the status quo." *See* 82 Fed. Reg. 55,542, 55,542 (Nov. 22, 2017). Defendants carry forward this characterization of the "status quo," arguing that the Clean Water Rule had been judicially enjoined and never "widely implemented." Defs.' Br. 28. But without the Suspension Rule, the Clean Water Rule would have become enforceable in

37 states absent further court decisions. Because of the Suspension Rule, the Clean
Water Rule was suspended for two years nationwide, and fewer streams and wetlands
will benefit from the pollution-control protections of the Clean Water Act. Had the
Agencies forthrightly explained the effects of the proposed suspension, and given the
public at least the presumptive 60 days for comment, it is likely that the number of
comments opposing the suspension would have increased, and that commenters could
have identified additional concerns for the Agencies to consider.

These violations of the APA's procedural requirements were not harmless.
*Contra* Defs.' Br. 31. In general, courts are not hospitable to claims of harmless error
when the government has failed to provide adequate notice-and-comment. *See Allina
Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). As the Second Circuit
recently explained, notice and comment "are not mere formalities," but are "basic to our
system of administrative law" because they "foster reasoned decisionmaking." *NRDC*,
894 F.3d at 115. Although merely "technical" failures of notice and comment may be
harmless, notice and comment violations are not harmless if there is sufficient
uncertainty regarding their effect on the agency's disposition. *See Shands Jacksonville
Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 265 (D.D.C. 2015).

Here, the violations very likely affected the rulemaking. Had the Agencies given
the public a full opportunity to comment on the merits of the Rule's suspension, they
likely would have received more substantive comments, and these might have raised
additional issues with respect to the viability or wisdom of suspending the Rule. At the
least, had the Agencies followed proper procedures, they almost certainly could not

17

have suspended the Rule on the same rushed timeline, which was critical to the outcome: preventing the Clean Water Rule from taking effect, even temporarily. That is because the Agencies should have noticed the proposed Suspension Rule for at least 60 days, and would have then needed to spend time responding to what would have likely been a larger volume of substantive comments. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (explaining that agencies "must consider and respond to significant comments received during the period for public comment").

The amount of time it is taking the Agencies to pursue their proposed repeal of the Clean Water Rule is informative. They proposed the repeal over a year ago, and received more than half a million comments, including arguments similar to what the Agencies should have considered when suspending the Rule, too, regarding its substantive benefits. The Agencies have been unable to finalize that rulemaking thus far, and recently issued a second, supplemental repeal notice, indicating they are still far from finalization. 83 Fed. Reg. 32,227, 32,230-31 (July 12, 2018).

Finally, to the extent Defendants are implying that their APA violations are harmless because no additional type or volume of critical comments could have changed their minds about suspending the Clean Water Rule, they are merely exchanging one APA violation for another, conceding an illegal prejudgment of the relevant issues.

**III.    Former Administrator Pruitt's mind was closed about the Suspension Rule**

The Agencies concede that a rule violates the APA and due process when clear and convincing evidence shows an agency decisionmaker had "an unalterably closed

mind on matters critical to the disposition" of that rule. *See* Defs.' Br. 41 (quoting *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979)). They also do not contest Plaintiffs' evidence that, for years leading up to the issuance of the Suspension Rule, former Administrator Pruitt exhibited an unwavering determination to prevent the Clean Water Rule from being enforced.[6] *See* Pls.' Opening Br. 20-22. The Agencies' insistence that this evidence falls short of showing an unalterably closed mind would nullify the law's protection against agency prejudgment.

While it may be appropriate, and in some cases desirable, for agency officials to explain their policy views relating to a rulemaking process, *see* Defs.' Br. 41, former Administrator Pruitt's actions and statements regarding the Clean Water Rule go far beyond that. Prior to his confirmation, Pruitt filed a lawsuit challenging the Clean Water Rule and sought a preliminary injunction to stop the Rule from taking effect. *See* Pls.' Opening Br. 21. After becoming Administrator, Pruitt continued his attacks on the Rule, maligning it publicly in speeches to interest groups and trade associations that were opposed to the Rule, and promising those same groups that the Agencies were going to repeal it. *See id.* at 21-22. When it became clear that the Sixth Circuit's stay of the Rule would dissolve before the Agencies had finalized the Rule's repeal, Pruitt adopted the Suspension Rule, telling a farming group that enforcement of the Clean

---

[6] Contrary to the Agencies' claim, *see* Defs.' Br. 43 n.15, extra-record evidence is admissible to demonstrate that a decisionmaker acted with an unalterably closed mind. *See* Pls.' Opening Br. 21 n.5; *see also Stand Up for California! v. U.S. Dep't of Interior*, No. 1:17-CV-00058, 2018 WL 2433576, at *5-6 (D.D.C. May 30, 2018) (granting discovery in APA case where plaintiffs showed prima facie case of unalterably closed mind).

Water Rule would be "the worst thing that could happen," so the Agencies have "steps in place to bar against that." *Id.* at 22.

This Court should not accept the Agencies' attempt to evade the clear implication of Pruitt's crusade against the Clean Water Rule. Their argument that Pruitt's closed mind regarding the Clean Water Rule is irrelevant to whether he had a closed mind regarding the Suspension Rule, *see* Defs.' Br. 43, is nonsensical. Pruitt's antipathy toward the Clean Water Rule is directly relevant to whether he had an open mind about suspending that Rule in order to give the Agencies time to try to repeal it outright, without having to enforce it in the meantime. Tellingly, the Agencies do not even attempt to argue that Pruitt actually had an open mind regarding the suspension.

In addition, the Agencies' reliance on cases where the court concluded that an *individual* statement did not show an unalterably closed mind, *see* Defs.' Br. 42-43, is misplaced here. Pruitt *repeatedly* attacked the Clean Water Rule, for several years. The Agencies' related suggestion that the Court must evaluate each of Pruitt's statements and actions in isolation, without considering their collective implications, *see id.* at 43, contravenes established standards for determining state of mind. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007) ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010) (where state of mind and intent are at issue, court should not view the record "piecemeal"). The fact that Pruitt's single-minded attacks on the Clean Water Rule remained so consistent over time is what

clearly and convincingly shows he was "totally incapable of giving fair consideration to the issues" at play in the Suspension Rule rulemaking. *See Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1179 (D.C. Cir. 1980); *see also* Pls.' Opening Br. 22.

The Agencies' observation that "no federal appeals court has vacated an agency rulemaking" on the basis of an unalterably closed mind, *see* Defs.' Br. 41, and suggestion that satisfying the standard is "practically impossible," *id.* (quoting *Ass'n of Nat'l Advertisers*, 627 F.2d at 1181 (MacKinnon, J., dissenting)), prove too much. While no appellate court has struck down a rule because a decisionmaker had an unalterably closed mind, appellate courts have repeatedly recognized that such a situation would violate the APA and due process. *See, e.g.*, *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 183 (D.C. Cir. 2015); *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1467 (9th Cir. 1987). And courts effectuate this doctrine when necessary. In *Nehemiah Corp. of America v. Jackson*, 546 F. Supp. 2d 830 (E.D. Cal. 2008), the court vacated a rule and, in remanding, also disqualified the Secretary who had made the "troubling" statement that the agency "would approve the new rule even in the face of critical comments." *Id.* at 847. In *Stand Up for California!*, the court allowed discovery where an official had stated the agency "had every intention of meeting" a self-imposed deadline before the change in administration. 2018 WL 2433576, at *5. And in *International Snowmobile Manufacturers Ass'n v. Norton*, 340 F. Supp. 2d 1249 (D. Wyo. 2004), the court vacated a rule banning snowmobiles in national parks where the agency official had made "definite statements" demonstrating a "prejudged political conclusion" by saying "there will be[] no future" for snowmobiles in national parks. *Id.* at 1260-61.

Pruitt's statements about the Clean Water Rule eclipse these. If Pruitt's ceaseless attacks on the Rule—starting before his time at EPA and continuing until his recent resignation—do not constitute clear and convincing evidence of an unalterably closed mind, it is difficult to imagine what would. The Court should reject the Agencies' proposal to render meaningless the law's protections against agency prejudgment.

## IV. The Suspension Rule should be vacated

The remedy for an APA violation is vacatur of the offending regulation. 5 U.S.C. § 706(2)(A), (D) ("The reviewing court shall . . . set aside" agency actions that are "arbitrary" or "without observance of procedure required by law."); *FCC v. NextWave Personal Comm'cns Inc.*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law.'"); *NRDC*, 894 F.3d at 116 (vacating a suspension rule and noting that the preexisting rule is "now in force"); *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) (vacatur is the "usual" remedy under the APA); *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 20 ("When a court concludes that agency action is unlawful, the practice of the court is ordinarily to vacate the rule." (internal quotation marks omitted)); *see also* Black's Law Dictionary (defining "set aside" as "to annul or vacate").[7]

---

[7] In a footnote, Defendants ask this Court not to issue a nationwide injunction. Defs.' Br. 45-46 n.17. But Plaintiffs are not asking for an injunction. They are seeking vacatur, which the Supreme Court has made clear is a different and "less drastic" remedy. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). The two cases Defendants cite, questioning the propriety of nationwide injunctions, are therefore inapposite. *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664-65 (9th Cir. 2011) (reversing nationwide injunction without addressing vacatur); *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393-94 (4th Cir. 2001) (reversing nationwide injunction while conflating,

The Defendants and Industry Groups do not dispute that vacatur is the presumptive remedy, but argue instead that courts "may" remand without vacatur in some circumstances. *See* Defs.' Br. 44; Industry Br. 27, ECF No. 91 (it is "not the law" that courts "must" vacate); *id.* at 33. But neither the Defendants nor Industry Groups have shown that such an exception is appropriate here. Most cases where courts decline vacatur bear no resemblance to this case. For instance, courts may decline to vacate where it would serve no purpose, because it would be impossible to restore the status quo prior to the illegal agency action. This was the case in *Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) (cited at Industry Br. 27), where an agency improperly disbursed sugar to farmers across the country, who then plowed under their own crops. *Id.* at 91-92, 97. Although that disbursal was contrary to law, once the crops were plowed under "the egg ha[d] been scrambled" and vacatur could not undo the effects of the illegal action. *Id.* at 97.

Courts may also decline to vacate a regulation involving payments to or from the government, because if the regulation were restored there might be no way to recover any under- or over-payments made during the vacatur, given the presumption against

---

contrary to *Monsanto*, vacatur of a regulation with an injunction). To the extent those cases question vacatur as the normal remedy for unlawful regulations, that contravenes the language of the APA as well as the law in those Circuits and the Supreme Court. *See* 5 U.S.C. § 706(2); *NextWave*, 537 U.S. at 300; *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 189 (4th Cir. 2009) ("For all agency actions, a reviewing court must set aside the action if it is found to be [unlawful]."); *S.E. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action."), *rev'd on other grounds sub nom. Coeur Alaska, Inc. v. S.E. Alaska Conservation Council*, 557 U.S. 261 (2009).

retroactive regulations. *See, e.g.*, *Shands*, 139 F. Supp. 3d at 269–70 (cited at Industry Br. 27-28). Courts may also decline to vacate where it would undermine the plaintiff's purpose in bringing the case, or the goal of the governing statute. *See North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008); *Envtl. Def. Fund, Inc. v. Adm'r, EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990); *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979) ("[W]e must be careful not to grant relief so broad as to endanger the Congressional scheme for the control of air pollution.") (cited at Industry Br. 27). This rationale also explains the Second Circuit's remand decision in *NRDC v. EPA*, 808 F.3d 556 (2d Cir. 2015) (cited at Defs.' Br. 44, Industry Br. 27). Although the court did not fully explain its remedy decision, the petitioners (some of whom are Plaintiffs here) were environmental groups that preferred to maintain the protections of an imperfect permit rather than allow a discharge that did not conform to any permit at all, which might have resulted from vacatur. *See id.* at 584. The Suspension Rule involves none of these considerations.

In determining whether to vacate, the D.C. Circuit counsels looking to the "seriousness of the order's deficiencies" and "the disruptive consequences" of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (internal quotation marks omitted). Both factors favor vacatur here. First, the illegality of the Suspension Rule is "serious." The violations were not a minor part of the rulemaking, but pervaded it completely: the suspension lacked any rational basis, its conclusions contradicted the record evidence, and it deprived the public of the right to participate fully in the process. These failures strike at the heart of the APA's requirement of rational and informed decisionmaking.

24

The violations were also serious in the sense that a remand alone cannot "cure" the illegality. *Cf. id.* at 151 (asking, with respect to the first factor, whether there is "a serious possibility" that the agency could substantiate its decision on remand). The Suspension Rule's purpose was to buy the Agencies time to attempt to repeal the Clean Water Rule, while neither enforcing it nor justifying their failure to do so. But duly promulgated regulations, like the Clean Water Rule, are the law: they must be enforced until they are properly revoked or vacated. *NRDC*, 894 F.3d at 113 ("A basic principle of administrative law is that an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked." (internal quotation marks omitted)). If the Court were to remand the Suspension Rule but keep the suspension in place, that would hand the Agencies exactly the illegal result they sought: time to try to repeal the Rule without having to enforce it, explain why they are not enforcing it, or satisfy the standard for reversing an existing rule, *see Fox Television Stations*, 556 U.S. at 515-16. Vacatur is therefore the appropriate remedy here. *See Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 21 (declining to stay vacatur of a rule delaying an effective date, because that "would simply remedy the agency's delay with more delay"); *California v. U.S. Bureau of Land Mgmt.* (*BLM I*), 277 F. Supp. 3d 1106, 1126 (N.D. Cal. 2017) (noting under similar circumstances that denying vacatur would be a "free pass for agencies to exceed their statutory authority and ignore their legal obligations under the APA").

Likewise, just as the procedural violations were not "harmless," *see supra* pp.17-18, they cannot be cured after the fact while leaving the suspension in place. The failure to consider relevant comments, the truncated comment period, and the misleading

description of the suspension's impact require vacatur because it is far from assured that the Agencies could validly suspend the Clean Water Rule if they had abided by the legally-required procedures for doing so. *See Allina Health*, 746 F.3d at 1110 ("[D]eficient notice is a "fundamental flaw" that almost always requires vacatur." (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009))); *Shands*, 139 F. Supp. 3d at 268 (concluding that the first *Allied-Signal* factor favored vacatur where the notice and comment flaw was "substantial" and "it is possible that the procedural error affected the Secretary's final decision").

Second, vacating the Suspension Rule, which would reinstate the Clean Water Rule automatically (outside the areas where it is enjoined),[8] will not have "disruptive" consequences. Defendants argue that it would be "complicated and inefficient" to reinstate a Rule that would apply in some states but not others, which is the result of two preliminary injunctions entered in other courts. Defs.' Br. 45; *see also* Industry Br. 31-32. But that simply repeats the flawed argument Defendants made in favor of the Suspension Rule in the first place. As explained above, *see supra* pp. 11-12, the Agencies gave no reason to think that applying the Clean Water Rule in some states but not others is problematic. State borders will make it clear where the Rule applies and where

---

[8] *See NRDC*, 894 F.3d at 115-16 (vacating a suspension rule and noting that the preexisting rule is "now in force"); *Paulsen*, 413 F.3d at 1008 ("The effect of invalidating an agency rule is to reinstate the rule previously in force."); *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("[B]y vacating or rescinding the recissions [*sic*]. . . , the judgment of this court had the effect of reinstating the rules previously in force."); *BLM I*, 277 F. Supp. 3d at 1126 (proceeding on the assumption that vacatur of a postponement reinstates the rule postponed).

it does not. And the Clean Water Act expressly contemplates some state-level variation in water quality regulations. *See* 33 U.S.C. § 1370.

The Industry Groups, for their part, complain that non-nationwide enforcement of the Rule will require them to "sort out" which regulation applies to which activities. Industry Br. 32. But surely national businesses routinely "sort out" differences in state law. And neither the Defendants nor Industry Groups have pointed to a single example of any problem resulting from the non-nationwide enforcement of the Clean Water Rule that took place during the fall of 2015. Indeed, the district courts that preliminarily enjoined the Rule both limited their injunctions to a subset of states at the express urging of the Defendants. PSUMF ¶ 15; Knicley Decl. Ex. 18 at 18-19, ECF No. 57-18; Defs.' Ltr., Ex. 1, ECF No. 83-1 at 25-26; Defs.' Updated Resp., ECF No. 154-1 in *Georgia v. Pruitt*, No. 2:15-cv-79 (S.D. Ga.), at 10-13.

The Industry Groups also claim that vacatur will be disruptive because the Clean Water Rule will increase costs and delay projects. Industry Br. 30-31. Even if one credits those assertions, routine business costs, like the costs of additional permitting at issue here, are not the kind of disruptive effect that overrides the presumption of vacatur. *See BLM I*, 277 F. Supp. 3d at 1125-26 (rejecting compliance cost argument as insufficient to avoid vacatur); *Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.* (*PEER*), 189 F. Supp. 3d 1, 3 (D.D.C. 2016) ("Absent a strong showing by [the agency] that vacatur will unduly harm economic interests . . . , the Court is reluctant to rely on economic disruption" to deny relief). Even courts that consider business costs in deciding whether to vacate may decline to give them dispositive weight. *See Standing*

27

*Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017)

(finding allegations of financial harm will not necessarily have a "determinative effect"

on remedy, because claims of "lost profits and industrial inconvenience" are "the nature

of doing business, especially in an area fraught with bureaucracy and litigation").

On top of that, the Industry Groups' actual evidence of increased business costs

is remarkably thin. They did not bother to submit updated declarations to this Court, or

even to re-submit old declarations. Instead, they cross-reference docket entries in other

courts. Industry Br. 30-31. Those cross-referenced declarations are stale, imprecise, and

often wildly mischaracterize the Clean Water Rule. One declaration, for instance, signed

in 2016, says a certain type of water body "may or may not be present" on the

declarant's property, and *if* it is present, and *if* it would be covered by the Clean Water

Rule, *then* this would cause unspecified "delays and costs." *See* Brown Decl. at "Texas

Addendum" 7a-8a (cited at Industry Br. 30). The declaration does not say, crucially,

whether these same water bodies would have been regulated without the Rule, too.

Another declarant claims his property has water features he previously "understood" to

be unregulated, and now the Rule "do[es] or may" cover them, so permits or

unspecified "changes in ranching practices" may be required. Canterbury Decl. at

"Texas Addendum" 9a-10a (cited at Industry Br. 30). Others are similarly vague. *See,*

*e.g.*, Cundy Decl. at "Texas Addendum" 31a-32a (claiming the company's land has

"features" that "do or may" constitute a covered water under the Rule, so the company

would need to take unspecified "further actions," and that permitting, in general, takes

"time and expenses"); Fry Decl. at "Texas Addendum" 57a (claiming the Rule will "likely" require the company's practices to be "modified" in unspecified ways).

One declarant misconstrues the Rule and pre-Rule regulatory regimes by claiming that "[c]urrent federal regulations say nothing about ditches" while the Rule covers "virtually any ditch with standing water." *See* Goldstein Decl. at "Texas Addendum" 63a. But in fact, the pre-Rule regulatory regime, just like the Rule, presumptively covers ditches with "standing water" if they function as tributaries. *Compare* EPA & Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States* (Dec. 2, 2008) (*Rapanos* Guidance)[9] at 6 n.24, 12 (tributaries covered by the pre-Rule regulatory regime include those that are "man-made"—*i.e.*, ditches—and ditches are exempt from regulation if they do not have "a relatively permanent flow of water" and are built in "uplands"—*i.e.*, dry land), *with* 33 C.F.R. § 328.3(b)(3)(i) (Clean Water Rule) (exempting from regulation ditches with "ephemeral flow"—*i.e.*, those that do not have a relatively permanent flow of water—if they are built in dry land and not a preexisting stream).

One declaration cited by the Industry Groups (Industry Br. 30 (citing "Texas Addendum" 86a-104a)) was signed in 2016, by Kelly Norton, who at that time was the President of the Arizona Mining Association. But Ms. Norton has since resigned that post, after being named an unindicted co-conspirator to federal fraud and bribery

---

[9] This document is available at https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf

charges. *See* Ryan Randazzo, *Arizona Mining Association President Kelly Norton resigns after ex-husband indicted*, The Republic, June 7, 2017, available at http://bit.ly/2G9YW68; *see also* ECF No. 83 in *United States v. Norton*, No. 2:17-cr-00713-JJT-3 (D. Ariz.), at 7. In short, these are stale, vague, unreliable declarations. They do not substantiate a claim of "disruption" sufficient to override the presumptive remedy of vacatur. *See, e.g.*, *PEER*, 189 F. Supp. 3d at 3 (ordering vacatur and noting the defendant had not made a "compelling case that rescission will cause significant consequences to [industry] because the forecasted harms are imprecise or speculative").[10]

Despite this paucity of evidence, it is plausible that some of the Industry Groups' members would need to obtain permits under the Rule that they would not have needed without the Rule. But the Industry Groups' dramatic suggestion that this uptick in permitting will be disastrous for the national economy is not credible. Their brief declares that the Rule will "take vast tracts of land out of use," for instance, Industry Br. 30, but the declarations cited for that point do not say so. And while some of the Industry Group declarations themselves make sensational claims, these are muddled or

---

[10] The Industry Groups make little effort to quantify the cost they will supposedly incur from additional permitting requirements under the Rule, instead taking refuge in conclusory words like "enormous" and "significant." Industry Br. 30; *see id.* (claiming vaguely that permits cost "tens of thousands of dollars"). This failure to quantify the costs to their members may explain the Industry Groups' odd reference in their brief to two comment letters from 2014, regarding the proposed Clean Water Rule, one from a Florida county and one from the Florida Stormwater Association, neither of which is a party here. The letters supposedly detail the Rule's costs for stormwater controllers. But the Industry Groups do not acknowledge the Rule's exemption for stormwater control features built in dry land. 33 C.F.R. § 328.3(b)(6). In any event, the Court should not credit two unsworn letters written four years ago by entities not before this Court and plucked from a docket that contains nearly a million comments.

implausible. One declarant, for instance, claims the Rule regulates entire watersheds, so "no transportation project [is] untouched." Hawkins Decl. at "Texas Addendum" 67a (cited at Industry Br. 31). But the Rule does not regulate whole watersheds. The statement seems to be a misreading of the Rule's definition of "significant nexus," which takes into account similarly situated waters within a watershed in determining whether they have significant impacts downstream. *See* 33 C.F.R. § 328.3(c)(5).

Another declarant claims that his property was not regulated prior to the Rule but will be regulated under the Rule, so the Rule makes it "impossible" to "improve the land." Jacobs Decl. at "Texas Addendum" 77a-78a. But there is no explanation for the declarant's dubious assumption that the stream on his property, which apparently reaches 8 feet deep and 30 feet wide at its peak, and flows into downstream navigable waters, *id.* at 76a, was not also regulated prior to the Rule. In fact it is at least plausible, if not very likely, that the stream has a "significant nexus" to downstream waters, such that it is within the scope of the pre-Rule regulations. *See Rapanos* Guidance, *supra* note 9, at 8 (pre-Rule regulatory regime covers ephemeral tributaries that have a significant nexus to traditional navigable waters). The declaration is suspect in other respects, too. It was signed in November 2016, yet complains of *prospective* harm from the Rule that will supposedly occur in what was then the past: 2015 and 2016. *See* Jacobs Decl. at "Texas Addendum" 75a, 78a. There is no mention of how the declarant used his land from October 2015 to November 2016, while the Rule was stayed.

Because the Industry Groups' claims of extreme economic hardship are not credible, *California Communities Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012), is

inapposite. There, the Ninth Circuit detailed concrete harms that could flow from vacatur of a Clean Air Act decision. These included the delay of a "much needed power plant," without which "the region might not have enough power next summer, resulting in blackouts," which in turn could necessitate the use of generators that pollute the air, "the very danger the Clean Air Act aims to prevent." *Id.* at 993-94. The court found that stopping construction on the plant could be "economically disastrous," as it was a "billion-dollar venture employing 350 workers." *Id.* at 994. These specific, significant harms are not equivalent to the vague, stale, unsupported, and often incorrect claims in the Industry Groups' papers.

The Industry Groups also argue that the Suspension Rule should not be vacated because, they say, the Clean Water Rule is illegal. They reproduce nearly word-for-word (and picture-for-picture) excerpts from a brief they recently filed in the District of North Dakota, which is one of the many district courts adjudicating the legality of the Clean Water Rule. *Compare* Industry Br. 10-29, *with* Am. Farm Bureau Federation et al. Amicus Br., ECF No. 218 in *North Dakota v. U.S. EPA*, No. 3:15-cv-59 (D. N.D.), at 7-36 (filed June 12, 2018). The legality of the Clean Water Rule is not at issue here, however, as this Court recognized in denying the Defendants' and Industry Groups' transfer motions.[11] While the Agencies should have considered the substantive impacts of the

---

[11] See Order, ECF No. 91 in *New York v. Pruitt*, No. 18-cv-1030, at 8 ("The Texas litigation concerns the validity of the [Clean Water Rule]; this litigation concerns the validity of the Suspension Rule. . . . The arguments for and against the legality of the Suspension Rule may be largely independent of the arguments regarding the merits of the [Clean Water Rule].").

Clean Water Rule when deciding to suspend it, as explained above, that does *not* mean that the *legality* of the Clean Water Rule's promulgation is at issue here; it decidedly is not. For instance, whether the Suspension Rule was promulgated legally, including whether the Agencies considered the impact on water quality from suspending the Clean Water Rule, has nothing to do with whether the Clean Water Rule was issued in violation of the Regulatory Flexibility Act (*see* Industry Br. 25). The irrelevance of these issues is highlighted by the fact that only the intervenors briefed them.[12]

The Industry Groups provide no example of a court doing what they are asking this Court to do here: namely, come to a premature and tangential decision on the legality of a rule whose legality is not at issue, but is being actively litigated in other courts, before vacating the illegal suspension of that rule. The Clean Water Rule is the law unless and until it is properly revoked by the Agencies or vacated by a court. This Court should treat it as such. *See Abington Mem'l Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984) ("[U]ntil rendered invalid by a court decision or replaced by a valid new regulation, the prior method of reimbursement remains operative."). In short, the Industry Groups' argument here that the Clean Water Rule is illegal and will harm them is aimed at the wrong court. Those arguments are properly addressed to, and have been thoroughly addressed to, the courts that are adjudicating the legality of the Clean Water Rule. This Court need not and should not reach those issues.

---

[12] In the Sixth Circuit, where the legality of the Clean Water Rule was at issue, the Industry Groups' arguments were thoroughly rebutted on their merits by the Justice Department in a 245-page brief filed January 13, 2017. *See* Br. for Resp'ts, ECF No. 149-1 in *Murray Energy Corp. v. EPA*, No. 15-3751 (6th Cir.), at 43-131, 151-220.

Finally, the Defendants point to litigation over a different regulation, called the Waste Prevention Rule, as an example of the "dysfunction and inefficiency" that could supposedly be avoided by declining vacatur here. Defs.' Br. 46-47. Although it is hard to tell from the Defendants' brief what aspect of that litigation they think is dysfunctional, it appears Defendants are unhappy that the California court enjoined a suspension rule it found to be illegal, because then the Wyoming court "had to" resume its case about the underlying rule. Defs.' Br. 47. But there is nothing wrong with that. The courts were doing what they were supposed to do: adjudicate disputes before them.

The Wyoming court's reference to the "dysfunction in the current state of administrative law," Defs.' Ltr., Ex. 1, ECF No. 51-1 at 2, should not be read as an attack on the California court's decision to enjoin the suspension rule at issue there. As with the Clean Water Rule, the predominant source of regulatory disruption surrounding the Waste Prevention Rule is the Trump administration's multiple, last-minute decisions to suspend duly promulgated regulations. These hasty suspensions disregarded legally-required procedures and resulted in slipshod rules that, in the case of the Waste Prevention Rule, quickly came undone. And all the while the administration was promising—but not delivering—formal repeal of the underlying rule.

In the case of the Clean Water Rule, that promise was made in the shape of a confusing scheme involving two proposed steps—first a repeal the Rule, and only later a replacement of the rule with a new definition. *See Definition of "Waters of the United States"—Recodification of Pre-Existing Rules*, 82 Fed. Reg. 34,899, 34,899 (July 27, 2017). Of course the Agencies then changed course by suddenly implementing "step zero"—the

34

Suspension Rule—and then they changed course again by adding step "one and a half": re-noticing, a year later, the proposed repeal (which had been "step one"). *See also* 83 Fed. Reg. at 32,238 (stating that the Agencies "may still propose" a replacement rule in the future). That disorganized, ad hoc approach to regulating is the root cause of the so-called "ping-ponging regulatory regime," ECF No. 51-1 at 11, or what the Industry Groups call the "crazy-quilt regulatory environment," Industry Br. 33. It is *not* the fault of the courts, tasked with adjudicating these illegal actions, nor should it in any way counsel against granting the standard remedy of vacatur for the Suspension Rule.

## CONCLUSION

The Agencies suspended the Clean Water Rule for two years without giving any regard to the substance of the Rule or the impacts of the suspension, and without giving a rational explanation for the decision. They also violated the public's right to participate fully in the rulemaking, which was presided over by an official who had made up his mind long ago about the outcome. There is no reason for this Court to deviate from Congress's instruction that such an illegal rule be "set aside."

The Suspension Rule is illegal, and it should be vacated.


Dated: July 30, 2018                      Respectfully submitted,

                                          /s/ Catherine M. Rahm
                                          Catherine Marlantes Rahm
                                          Natural Resources Defense Council
                                          40 West 20th Street
                                          New York, NY 10011
                                          Phone: (212) 727-4628
                                          E-mail: crahm@nrdc.org

Jennifer A. Sorenson, admitted *pro hac vice*
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Phone: (415) 875-6164
E-mail: jsorenson@nrdc.org

Jared E. Knicley, admitted *pro hac vice*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: (202) 513-6242
E-mail: jknicley@nrdc.org